FILED AUGUST 22, 2008
08CV4805
JUDGE MORAN
MAGISTRATE JUDGE COLE
EDA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **AFN, LLC, an Illinois Corporation,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | |
| **KASEEM SINCENO, an individual,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, AFN, LLC ("AFN"), by and through its attorneys, for its Complaint against Defendant, Kaseem Sinceno ("Defendant") states as follows:

### JURISDICTION AND VENUE

1. This is an action seeking monetary damages and injunctive relief arising from Defendant's illegal activities and sounding in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, theft, conversion, tortious interference with prospective economic advantage and breach of contract.

2. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, based on a claim arising under the Computer Fraud and Abuse Act, 18 U.S.C. §1030 *et seq.*, and supplemental jurisdiction over AFN's tort claims pursuant to 28 U.S.C. §1367.

3. This Court has jurisdiction over Defendant and venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant resides in this District, and because the acts giving rise to the claims contained herein arose in this district.

## AFN, LLC

4.  Founded in 2003, AFN provides logistical and transportation services to assist its clients in transporting freight from point to point. Specifically, AFN assists clients who need to transport their products in ascertaining the most cost-effective method to transport their freight. Similarly, AFN assists its shipping clients in maximizing the amount of freight transported in each load, which increases their efficiency and decreases their ultimate costs. The service that AFN provides is often referred to as third party logistics.

5.  AFN employs approximately 100 employees at its Deerfield, Illinois headquarters, including roughly 12 customer sales representatives ("CSR").

6.  CSRs are the backbone of AFN's business. Essentially, CSRs are responsible for identifying and servicing AFN clients. Initially, this means that CSRs are responsible for cold-calling and meeting with potential AFN clients. CSRs identify companies and individual contacts by consulting industry literature, following up leads developed by other CSRs, by fielding phone calls from potential customers requesting rate quotes, by accessing information maintained in AFN's proprietary software and database, and by utilizing certain online corporate accounts (*e.g.*, Hoovers), set up and paid for by AFN. At AFN, a CSR's job is to ascertain companies' or individuals' freight transportation needs, provide competitive pricing proposals, and then provide superior customer service in creatively solving logistical problems and emergencies that arise from time to time.

7.  As part of their duties, CSRs often utilize online corporate accounts, set up and paid for by AFN, which provide access to information regarding AFN's customers and potential customers. AFN provides its CSRs with login and password information for these online

corporate accounts so that the CSRs may utilize the online corporate accounts as part of their job duties with AFN. One such online account, to which AFN provides its CSRs access, is Hoovers.

8. All CSRs are given access to AFN's Hoovers corporate account as part of their job duties with AFN. AFN instructs the CSRs to maintain the confidentiality of all passwords, including the password used for AFN's Hoover's corporate account. CSRs are not authorized to use AFN's passwords to access its online corporate accounts following the termination of employment.

**DEFENDANT'S EMPLOYMENT AT AFN**

9. On or about May 10, 2007, Defendant began his employment with AFN in the position of CSR. On or about May 10, 2007, Defendant signed an employment agreement with AFN (the "Employment Agreement") agreeing to certain terms and conditions during his employment, and following his employment at AFN. A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

10. On or about Tuesday, July 15, 2008, Defendant spoke to Brian Barrick, a CSR for AFN ("Barrick"). Defendant told Barrick that he needed to take his girlfriend to the hospital and would not be coming into work.

11. As AFN was concerned about Defendant's well-being, and that of his girlfriend, various members of management at AFN attempted to contact Defendant on multiple occasions following his July 15, 2008 absence.

12. Defendant failed to show up for work again on Wednesday, July 16, 2008, and failed to call AFN to explain his absence.

13. Defendant failed to show up for work again on Thursday, July 17, 2008, and, once again, failed to call AFN to explain his absence.

3

14. Defendant failed to show up for work again on Friday, July 18, 2008, again failing to call AFN to explain his absence.

15. Defendant failed to show up for work again on Monday, July 21, 2008. Once again, Defendant did not call AFN to explain his absence.

16. Because Defendant failed to show up for work, and had not called AFN to explain his absences, he violated AFN's no call/no show policy. Accordingly, pursuant to the terms of that policy, AFN deemed Defendant to have voluntarily resigned his employment.

17. On or about Tuesday, July 22, 2008, Ryan Daube, Owner of AFN ("Daube"), received a text message from Defendant confirming that he resigned from his employment at AFN.

18. On or about Thursday, July 24, 2008, Daube and Defendant spoke over the telephone. Defendant again confirmed to Daube that he had resigned from his job with AFN. AFN accepted Defendant's resignation.

19. On or about Thursday, July 24, 2008, AFN sent an Employment Separation Letter to Defendant confirming his resignation and reminding Defendant about his post-employment obligations under the Employment Agreement.

## AFN DISCOVERS DEFENDANT'S ILLEGAL ACTS

20. On Monday, July 28, 2008, thirteen days after Defendant had last shown to work, and approximately a week after his resignation from AFN, AFN Vice President of Sales, Jerry Beach ("Beach") received an automatic email from AFN's Hoovers corporate account. The email was an automatic delivery confirmation, confirming an email sent from AFN's Hoovers corporate account to a corporate representative of one of AFN's established customers ("Customer A").

21. The July 28, 2008 Hoovers confirmation email, which Beach received, confirmed that, following his resignation from AFN, Defendant had logged onto AFN's Hoovers corporate account without authorization, and sent an email using AFN's Hoovers corporate account to Customer A seeking business directed to Defendant at his new employer, one of AFN's competitors.

22. In the July 28, 2008 email which Defendant sent using AFN's Hoovers corporate account, Defendant identified himself as an employee of Freight Management Inc. (one of AFN's competitors) and solicited the business of Customer A (one of AFN's customers).

## COUNT I
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

23. AFN incorporates the allegations made and contained in Paragraphs 1 through 22 by reference.

24. The AFN computer network, used by Defendant during his employment, is a "protected computer," which is used across state lines in interstate commerce, has internet access across states lines, and is used to transfer AFN information concerning its services in interstate commerce.

25. AFN did not authorize Defendant to access its Hoovers online corporate account following his resignation from AFN. AFN did not authorize Defendant to access its Hoovers online corporate account to solicit AFN's customers, in violation of Defendant's Employment Agreement.

26. Through his action, Defendant has:

   a. Intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage and loss to AFN in excess of $5,000 in violation of 18 U.S.C. §1030(a)(5)(A)(ii); and

    b. Intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss to AFN in excess of $5,000 in violation of 18 U.S.C. §1030(a)(5)(A)(iii).

27. AFN has suffered damages and loss as a result of Defendant's actions in an amount to be determined at trial.

## COUNT II
## THEFT

28. AFN incorporates the allegations made and contained in Paragraphs 1 through 27 by reference.

29. Defendant obtained or exerted unauthorized control over AFN's property with the intent to permanently deprive AFN of the use or benefit of that property by taking AFN's Hoovers corporate account password without authorization, and by accessing AFN's Hoovers corporate account without authorization and using such account to obtain information regarding AFN's customers so as to solicit AFN's customers in violation of Defendant's Employment Agreement.

30. Defendant's theft damaged AFN by depriving it of its password for its Hoovers corporate account and by depriving it of information regarding AFN's customers, as well as the profits that would have accrued to AFN by using that information.

31. AFN has suffered damages as a result of Defendant's actions in an amount to be determined at trial.

## COUNT III
## CONVERSION

32. AFN incorporates the allegations made and contained in Paragraphs 1 through 31 by reference.

33. AFN has the right to immediate possession of its confidential password used for its Hoovers corporate account.

34. AFN has the right to immediate possession of the information that is contained in its Hoovers corporate account.

35. Defendant intentionally, and without authorization, assumed control of AFN's confidential password and that information contained in AFN's Hoovers corporate account, and deprived AFN of that information by accessing AFN's Hoovers corporate account without authorization and using such account to obtain information regarding AFN's customers so as to solicit AFN's customers in violation of Defendant's Employment Agreement.

36. Defendant's conversion damaged AFN by depriving it of its confidential password for its Hoovers corporate account and by depriving it of information regarding AFN's customers contained on the Hoovers corporate account, as well as the profits that would have accrued to AFN by using that information.

37. AFN has suffered damages as a result of Defendant's actions in an amount to be determined at trial.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

38. AFN incorporates the allegations made and contained in Paragraphs 1 through 37 by reference.

39. AFN had a reasonable expectation of entering into a valid business relationship with Customer A, to continue to work with Customer A, and to be its designated third party logistics provider.

40. Defendant knew of AFN's reasonable expectancy.

41. On information and belief, Defendant purposefully interfered with AFN's relationship with Customer A in order to prevent AFN's reasonable and legitimate expectancy from being fulfilled.

42. Defendant's interference with AFN's corporate opportunity caused AFN to suffer damages.

43. AFN is entitled to recover its damages, the amount of which will be determined at trial.

### COUNT V
### BREACH OF CONTRACT

44. AFN incorporates the allegations made and contained in Paragraphs 1 through 43 by reference.

45. Defendant's Employment Agreement is a valid and enforceable contract.

46. AFN performed its duties under the Employment Agreement with Defendant.

47. Paragraph 6.d. of Defendant's Employment Agreement provides:

> d. <u>Non-Interference with Business Relationships</u>. Associate covenants and agrees that during his/her employment with the Company and for a period of eighteen (18) months after the date of termination of Associate's employment (whether such termination is initiated by Associate or the Company, for any reason) (the "Restriction Period"), Associate will not, directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venturer, investor, employer, director, manager, officer, Associate, consultant, agent, or in any other manner or capacity whatsoever:
>
> (i) induce, advise, request, entice, or solicit any other person or entity which has a business relationship with the Company or any of the Affiliates to discontinue, reduce the extent of, discourage the development of, or otherwise adversely affect such relationship with the Company or any of the Affiliates.
>
> (ii) in any manner competitive with or adverse to the Company or the Affiliates, (A) solicit, accept business from, or otherwise agree to provide any Competitive Service to, or (B) assist, request, induce or influence any Competitive Business (as defined herein) to solicit or accept business from, or otherwise agree to provide any Competitive Service to:

    (1) any individual or entity who is a customer or carrier of the Company or the Affiliates, with whom Associate had contact during his/her employment with the Company; or

    (2) any individual or entity who is or was a customer or carrier of the Company or Affiliates (or their respective predecessors) during the twelve (12) months preceding the date upon which such solicitation or acceptance of business occurred, with whom Associate had contact during his/her employment with the Company…

48. Paragraph 7 of Defendant's Employment Agreement provides:

  7. <u>Remedies</u>. Associate understands and acknowledges that the Company will not have an adequate remedy at law for the breach or threatened breach by Associate of any one or more of the Covenants, and that the damages the Company may sustain in the event of a breach of the Covenants is difficult, if not impossible to predict.  Therefore, Associate agrees that in the event of any such breach or threatened breach, the Company shall be entitled, in addition to any other remedies which may be available to it, to injunctive relief (without bond) to enjoin Associate from the breach or threatened breach of the Covenants…

49. Paragraph 8 of Defendant's Employment Agreement provides:

  8. <u>Attorneys' Fees and Costs</u>.  In addition to the remedies provided in Section 7 of this Agreement, Associate agrees to pay all costs and expenses, including, without limitation, all attorneys' fees, costs, and experts' fees and costs, incurred by the Company in enforcing this Agreement or in defending against any action brought by Associate concerning it.  Nothing contained in Sections 7 or 8 of this Agreement shall be interpreted to in [sic] way limit whatever other damages may be available to the Company, in law or in equity.

50. Defendant has breached Paragraph 6.d. of his Employment Agreement by using AFN's confidential password to access its Hoovers corporate account and by illegally accessing AFN's Hoovers corporate account to utilize the corporate account to solicit AFN's customers. Moreover, Defendant has breached Paragraph 6.d. by interfering with and disrupting actual and prospective business relationships of AFN through the illegal activities described in Paragraphs 1 through 49, above.

51.　　AFN has suffered damages and will continue to suffer damages as a result of Defendant's actual breach and the probability of future breach, and has been irreparably harmed by, *inter alia*, the loss of business relationships and good will, the loss of reputation in the marketplace and the competitive advantage that will be gained by others as a consequence of Defendant's actions.

## JURY DEMAND

52.　　Plaintiff, AFN, LLC, requests a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, AFN respectfully requests that this Court enter an Order which:

1. Orders Defendant to immediately cease use of any and all AFN passwords, proprietary information or other confidential information, and enjoins any such use in the future.

2. Orders Defendant to immediately return all AFN property, including, but not limited to, all electronic information and data (including passwords), hard copies of that information, customer names and contact information, to AFN.

3. Orders Defendant to immediately cease contacting AFN customers in violation of his Employment Agreement, and to otherwise abide by the terms of the Employment Agreement.

4. Awards AFN the damages it suffered, in an amount to be determined at trial, including its costs, expense and attorneys' fees; and,

5. Grants AFN such further relief as the Court deems just and appropriate.

Dated: August 22, 2008               Respectfully submitted,

                                     AFN, LLC


                                     By: s/ Keith A. Dorman
                                         One of Its Attorneys

Keith A. Dorman (kdorman@mcguirewoods.com)
Christine C. Kommer (ckommer@mcguirewoods.com)
McGuireWoods LLP
77 West Wacker Dr., Ste. 4100
Chicago, Illinois 60601
T: (312) 849-8100
F: (312) 849-3690

\6456558.1



# Terms of Employment

**THIS AGREEMENT** is made and agreed to effective May 14, 2007 (the "Effective Date"), by and between AFN, LLC (the "Company" or "AFN") and Kaseem Sinceno ("Associate").

**WHEREAS**, the Company is engaged in the business of providing freight brokerage and transportation logistics services (the "Business").

**WHEREAS**, the parties have mutually agreed to the terms set forth below, and Associate enters into the following covenants, including to refrain from soliciting the Company's customers, carriers, and Associates, and from disclosing Confidential Information, in consideration for his/her employment and continued employment with the Company and receipt from the Company of his/her compensation, employment benefits, and other terms and conditions of his/her employment with the Company.

**NOW, THEREFORE, IT IS AGREED AS FOLLOWS:**

1. <u>Employment</u>. The Company hereby agrees to engage Associate, commencing on the Effective Date, to render employment services to the Company, and Associate hereby accepts such engagement and agrees to provide employment services to the Company, upon the terms and conditions set forth in this Agreement.

2. <u>Duties and Responsibilities</u>. Associate shall serve in the capacity described in <u>Exhibit A</u>. Associate shall be employed on a full-time basis and shall devote his/her best efforts and all of his/her business time and attention to the business and affairs of the Company and shall diligently, faithfully, and competently perform his/her duties and responsibilities hereunder. As used herein, "full time" means the regularly established working hours of the Company and such additional hours as the Business of the Company shall require. Associate understands and agrees that (s)he is an Associate at will and that employment with the Company is for no definite period and may be terminated by Associate or the Company at any time, for any reason, with or without cause, with or without notice.

3. <u>Compensation and Benefits</u>. In consideration of all services to be performed hereunder, the Company agrees to pay, and the Associate accepts as full and complete compensation, the compensation and other benefits described in <u>Exhibit A</u>. The Company, in its sole discretion, may modify the compensation, benefits, title, or job duties of Associate, including by increasing or decreasing Associate's compensation. Any such modification shall not affect the other provisions, covenants, or restrictions in this Agreement, unless agreed to in writing by Associate and the Company's Board of Managers. Upon termination of Associate's employment with the Company (whether initiated by Associate or by the Company, for any reason), Associate shall pay in full any amounts owed to the Company.

4. <u>Corporate Opportunities</u>. Associate shall refer to the Company all opportunities to provide services similar to those available through the Company or any of its Affiliates (as defined herein), whether or not related to the Business, so long as Associate is in the employ of the Company. The Company shall have the right to accept or reject such opportunities within its sole discretion.

5. <u>Associate Work Product and Inventions</u>.

   a. Associate hereby assigns and agrees to assign to Company all of Associate's right, title and interest in any developments, designs, patents, inventions and improvements, software programs and any modifications or enhancements, thereto, trade secrets, trademarks, copyrightable subject matter or proprietary



EXHIBIT A



# Terms of Employment

information which Associate has made or conceived, or may make or conceive, either solely or jointly with others, while providing services to Company or the Affiliates, or with the use of the time, material or facilities of the Company or the Affiliates or relating to any actual or anticipated business, research, development, product, service or activity of the Company or the Affiliates known to Associate while employed by the Company, or suggested by or resulting from any task assigned to Associate or work performed by Associate for or on behalf of the Company or the Affiliates, whether or not such work was performed prior to the date of this Agreement, or otherwise relating to or arising out of Associate's employment with the Company (collectively "Covered Work"). Associate agrees that, to the extent such Covered Work is eligible for copyright protection in the United States or elsewhere, such work shall be a "work made for hire." Associate hereby waives and agrees not to assert any moral rights or similar rights under the laws of any jurisdiction with respect to any Covered Work. Associate further agrees, that without charge to the Company, but at its expense, Associate will promptly execute and deliver all such further documents as may be necessary, including original applications and applications for renewal, extension or reissue of such patents, and trademark and copyright registrations, in any and all countries, to vest title thereto in the Company.

    b. Associate acknowledges and understands, the foregoing to the contrary notwithstanding, that this section does not waive or transfer Associate's rights to any Covered Work for which no equipment, supplies, facility or trade secret or Confidential Information (as defined herein) of the Company was used and which was developed entirely on Associate's own time, unless the Covered Work relates to the business of the Company or to the Company's research or development or the results of any work that Associate performed for the Company during the term of Associate's employment relationship with the Company.

6. <u>Confidentiality and Non-Interference</u>. During the course of his/her employment with the Company, Associate will be exposed to Confidential Information of the Company and its Affiliates. Associate acknowledges that it would be improper and would give the Company's competitors an unfair advantage if Associate were to disclose such Confidential Information to the Company's competitors. Associate further recognizes and agrees that the Company's business relationships with its customers and carriers are a valuable and critical asset of the Company. Associate acknowledges that such relationships are secured and developed at great cost and with much effort, and the diversion of which would irreparably harm the Company's business. Associate acknowledges that (s)he would not have had contact with or knowledge of said customers and carriers but for his/her employment with the Company. Accordingly, in consideration for his/her employment, Associate enters into the covenants set forth in this Section 6 (the "Covenants") in order that the Company may protect its legitimate business interests in its valuable Confidential Information and trade secrets, and its relationships with its customers and carriers, and the goodwill associated therewith. Associate acknowledges that the Covenants are reasonable in scope and essential to the preservation of the legitimate business interests of the Company and its Affiliates. Associate also acknowledges that enforcement of the Covenants will not preclude Associate, if the Associate's employment with the Company is terminated (whether such termination is initiated by Associate or by the Company, for any reason), from being gainfully employed.

    a. <u>Confidentiality</u>. During and after Associate's employment with Company, Associate agrees: (i) to hold the Confidential Information of the Company and its Affiliates in strict confidence; (ii) not to directly or indirectly give, disclose, or permit to be disclosed any Confidential Information to any person or entity (other than Associates and officers of the Company and the Affiliates on a need-to-know basis only) except as otherwise directed in writing by the Company's Board of Managers; (iii) not to permit any person or entity (other than Associates and officers of the Company and the Affiliates on a need-to-know basis only) to examine or make copies or other reproductions of any documents, items or other tangible things which



# Terms of Employment

may contain or may be derived from Confidential Information, whether prepared by Associate or otherwise coming into Associate's possession or control; (iv) not to use or permit to be utilized any Confidential Information for Associate's own benefit or the benefit of any person or entity other than the Company and the Affiliates, or the Company's customers and carriers when so directed by the Company, and (v) to use any passwords and access codes provided by the Company solely to perform his/her job responsibilities for the Company and the Affiliates and to promote the Company's and the Affiliates' Business and will not disclose any such passwords or access codes to anyone, including, but not limited to, other persons employed or engaged by the Company. Upon the earlier of (A) termination of Associate's employment with Company (whether such termination is initiated by the Associate or the Company) or (B) demand by the Company, Associate shall promptly surrender to Company, without retaining copies, all tangible things which are or contain Confidential Information, as well as all computer hardware and software, computer printouts, computer disks, work papers, files, customer lists, carrier lists, supplier lists, telephone and/or address books, rolodex cards, internal memoranda, appointment books, calendars, Associate handbooks and manuals, letters, records, documents, books, forms, plans, manuals, slides, transparencies, recordings, booklets, photographs (or similar reproductions), training and seminar materials and all other information, recorded and written material, and all other data, information, documents or tangible items of every kind relating to Company or the Affiliates, customers, carriers, or programs, whether said material is in written, electronic or other form, even if said materials do not contain Confidential Information.

      b.     "Confidential Information". For purposes of this Agreement, "Confidential Information" means any and all information regarding the Company and the Affiliates (as defined herein) or their respective Business or proposed future business, including, without limitation, ideas; concepts; know-how; methods; techniques; structures; information and materials relating to engineering data; marketing plans; organizational research and development; inventions; discoveries; improvements; drawings; current and prospective customer and carrier lists and customer and carrier information; personnel information, including the identity of other Associates of the Company and the Affiliates, their responsibilities, competence, abilities and compensation; sales forecasts; pricing and financial data; service and operational manuals and documentation therefore; intellectual property; software; internal business procedures; business plans; information concerning planned or pending acquisitions or divestitures; and information concerning purchase of major equipment or property; provided, however, that (i) the term "Confidential Information" does not include information which is in the public domain through no fault of the Associate, is obtained by Associate from a third party having the legal right to use and disclose the same, or is rightfully in possession of Associate before the date of Associate's employment with the Company, and (ii) Associate shall not be in violation of Section 6(a) in the event Associate is legally compelled to disclose any of the Confidential Information, provided that in any such event Associate will provide the Company with reasonably prompt written notice prior to any such disclosure so that the Company may obtain a protective order or other confidential treatment for the Confidential Information, and in the event that a protective order or other remedy is not obtained by the Company, Associate will furnish only that portion of the Confidential Information which Associate is advised by opinion of legal counsel is legally required to be furnished.

      c.     "Affiliates." For purposes of this Agreement, "Affiliates" means (i) the Company's present and former parent companies, subsidiaries, successors, affiliated and related companies, and (ii) a person or entity, directly or indirectly through one or more intermediaries, that is in control of, or controlled by, or under common control with, the Company.

      d.     Non-Interference with Business Relationships. Associate covenants and agrees that during his/her employment with the Company and for a period of eighteen (18) months after the date of termination of Associate's employment (whether such termination is initiated by Associate or the



# Terms of Employment

Company, for any reason) (the "Restricted Period"), Associate will not, directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venturer, investor, employer, director, manager, officer, Associate, consultant, agent, or in any other manner or capacity whatsoever:

        (i)    induce, advise, request, entice, or solicit any other person or entity which has a business relationship with the Company or any of the Affiliates to discontinue, reduce the extent of, discourage the development of, or otherwise adversely affect such relationship with the Company or any of the Affiliates. As used herein, "Competitive Service" means freight brokerage or transportation logistics services, and any other services similar to the services provided or offered by or through the Company or the Affiliates at any time during the Restricted Period.

        (ii)    in any manner competitive with or adverse to the Company or the Affiliates, (A) solicit, accept business from, or otherwise agree to provide any Competitive Service to, or (B) assist, request, induce, or influence any Competitive Business (as defined herein) to solicit or accept business from, or otherwise agree to provide any Competitive Service to:

        (1)    any individual or entity who is a customer or carrier of the Company or the Affiliates, with whom Associate had contact during his/her employment with the Company; or

        (2)    any individual or entity who is or was a customer or carrier of the Company or the Affiliates (or their respective predecessors) during the twelve (12) months preceding the date upon which such solicitation or acceptance of business occurred, with whom Associate had contact during his/her employment with the Company.

        (iii)    (A) solicit, recruit or attempt to recruit, or otherwise induce or influence any Associate, consultant, sales representative, agent, or other personnel of the Company or any of the Affiliates to discontinue or otherwise terminate such relationship with the Company or any of the Affiliates, or (B) employ, retain, engage, or seek to employ, retain, or engage or cause any Competitive Business (as defined herein) to employ, retain, engage, or seek to employ, retain, or engage as an Associate, consultant, sales representative, or agent, any person who is then (or was at any time within the twelve (12) month period preceding the date Associate or the Competitive Business employs, retains, engages, or seeks to employ, retain, or engage such person) an Associate, consultant, sales representative, agent, or other personnel of the Company or any of the Affiliates. As used herein, "Competitive Business" means any person or entity which offers or provides a Competitive Service.

7.    <u>Remedies</u>. Associate understands and acknowledges that the Company will not have an adequate remedy at law for the breach or threatened breach by Associate of any one or more of the Covenants, and that the damages the Company may sustain in the event of a breach of the Covenants is difficult, if not impossible to predict. Therefore, Associate agrees that in the event of any such breach or threatened breach, the Company shall be entitled, in addition to any other remedies which may be available to it, to injunctive relief (without bond) to enjoin Associate from the breach or threatened breach of the Covenants. If Associate is deemed by a court of competent jurisdiction to have breached any of the Covenants, the Restricted Period shall be extended by the period of time between the date of Associate's termination of employment with the Company (whether such termination was initiated by Associate or the Company) and the date the court enters its injunction restraining further breach of said covenants; and



# Terms of Employment

8. <u>Attorneys' Fees and Costs</u>. In addition to the remedies provided in Section 7 of this Agreement, Associate agrees to pay all costs and expenses, including, without limitation, all attorneys' fees, costs, and experts' fees and costs, incurred by the Company in enforcing this Agreement or in defending against any action brought by Associate concerning it. Nothing contained in Sections 7 or 8 of this Agreement shall be interpreted to in way limit whatever other damages may be available to the Company, in law or in equity.

9. <u>Severability</u>. This Agreement shall be liberally construed to maximize protection of Company's rights in Confidential Information and business relationships. If any provision of this Agreement is held overbroad, invalid or otherwise unenforceable under the applicable law and circumstances by the reviewing court, the parties agree to a modification by the reviewing court of the provisions at issue (including temporal or geographic scope) to the minimum extent necessary to render said provision enforceable, and if such a modification is not possible, said provision shall be deemed severed, and the remainder of the Agreement shall remain in full force and effect.

10. <u>Notice to Future Employers</u>. Associate agrees that during the Restricted Period, Associate will notify the Company in writing of any subsequent occupation of Associate, whether as owner, Associate, officer, director, agent, consultant, independent contractor, or the like, and his/her duties and responsibilities in that position. Further, Associate agrees that during said period, he/she will inform each new employer or other person or entity engaging Associate, prior to accepting employment or engagement, of the existence of this Agreement and the terms contained herein. Associate acknowledges that during said period, the Company shall have the right to contact, independently, any potential or actual future employer or other person engaging Associate to notify it of Associate's obligations under this Agreement and provide such employer or other person engaging Associate with a copy of this Agreement. The Company also shall be entitled, at its election, to notify any such actual or potential employer or other person engaging Associate of the Company's understanding of the requirements of this Agreement and what steps, if any, the Company intends to take to ensure compliance with or enforcement of this Agreement. Failure of the Company to avail itself of the benefits of this subsection shall not in any way effect its right to obtain enforcement of any provision of this Agreement.

11. <u>No Conflicting Obligations or Use</u>. (a) Associate represents and warrants to the Company that his/her execution of this Agreement and the performance of the terms and conditions contained herein does not constitute a breach of any agreement to which Associate is a party (including, without limitation, any such agreement with a previous employer). In addition, Associate agrees not to use in connection with his/her employment hereunder, or to disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or other person or entity. The foregoing restriction shall not apply with respect to information and material which is generally publicly available without restraint and thus is not confidential or proprietary.

(b) Without limiting the "at will" nature of Associate's employment with the Company, in the event Associate shall be permanently enjoined by a court of competent jurisdiction from being employed by the Company based on his/her prior employment relationship, or in the event the Company shall be enjoined from employing Associate, then Associate's employment shall terminate on the effective date of such injunction.

(c) The Associate understands that the Company is relying upon the above representations and warranties in offering the Associate employment, and the Associate will indemnify and defend the Company from any loss, cost, damage or expense (including attorneys' fees), that may arise directly or

 **Terms of Employment**

indirectly from the breach or falsity of the representation and warranties set forth herein or any other breach of this Agreement by Employee.

12. Entire Agreement. It is understood and agreed that this Agreement is the only Agreement of employment between the parties. This Agreement is the parties' entire understanding on its subject matter, and supersedes all prior understandings. No other representations, promises, agreements, or understandings, whether oral or written, shall be of any force or effect.

13. Assignment. The parties acknowledge and agree that the covenants, terms and provisions contained in this Agreement constitute a personal employment contract and the rights and obligations of Employee hereunder cannot be transferred, sold, assigned, pledged or hypothecated by Employee. However, the rights and obligations of the Company and its Affiliates under this Agreement may be assigned or transferred pursuant to a sale of the business, merger, consolidation, share exchange, sale of substantially all of the Company's or any of the Affiliates' assets, or other reorganization, or through liquidation, dissolution or otherwise, whether or not the Company or any of the Affiliates is the continuing entity.

14. Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to conflicts of law principles, and may be modified only by a writing signed by Employee and the Company's Board of Managers. All actions in any way arising out of or related to this Agreement shall be litigated exclusively in courts within the County of Cook, State of Illinois, and Employee hereby consents and submits to the venue and jurisdiction of any local, state or federal court located within Cook County, Illinois. The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon Forum Non Conveniens.

15. No Waiver. The failure to enforce any of the provisions of this Agreement will not be construed as a waiver of that right or any other provision or right.

16. Survival. The terms contained in Sections 5 through 15 are continuing, absolute, and unconditional, and shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement:

EMPLOYEE: _____  Date: 6/10/07

ADVANTAGE FREIGHT NETWORK, LLC:

By: _____

Its: _____  Date _____



Exhibit A

### EXHIBIT A

a.  **Title and Duties.** Associate shall be employed as a Customer Sales Representative and shall have such normal and customary duties and responsibilities commensurate with his/her position as the Company's Board of Managers shall determine from time to time in its sole and absolute discretion. Associate shall report to Chris Liberty and the Board of Managers of the Company. In addition to, or in lieu of, the foregoing, Associate also shall perform such other services and duties as may be assigned to him/her from time to time by the Board of Managers or such other person or persons as the Board of Managers may designate.

b.  **Compensation.** During Associate's employment with the Company, commencing on the date of this Agreement, in full and complete payment of all services to be performed hereunder, the Company agrees to pay, and the Associate agrees to accept, the following compensation:

   (i)   A [base salary/monthly draw] of $55,000 payable in bi-monthly installments; and

   (ii)  Under no circumstances is Associate eligible to receive, nor will Associate receive, commissions on sums collected by the Company from its customers or sums paid by the Company to its carriers after Associate's final date of employment with the Company (whether termination of Associate's employment is initiated by Associate or by the Company, for any reason).

   (iii) Commissions shall be calculated in accordance with the Policy and shall be paid to the Associate by the Company no later than the last business day of the month immediately following the month in which such commissions are earned (as described in the Policy). The Associate shall not have the authority to make any allowances with respect to the amounts charged by the Company to its customers without the prior written approval of the Company's Board of Managers. If any allowances are made by the Company, any commissions previously paid to the Associate in respect of the transaction for which an allowance has been made shall be deducted from the Associate's next commission check or reimbursed by the Associate if this Agreement has been terminated (whether such termination has been initiated by the Associate or by the Company). The Company shall not be liable for any failure to provide service or accept orders due to accident, fire, strikes, action of the elements, shortage of labor, transportation, or any cause whatsoever beyond its control.

   (iv)  The Company reserves the right to amend or revise its commission rates at any time on not less than seven (7) days notice to the Associate and such amendment or revision shall not be construed as a termination of this Agreement.

c.  **Withholding.** All compensation described in this Agreement shall be subject to withholding for federal, state or local taxes, amounts withheld under applicable benefit policies or programs, and any other amounts that may be required to be withheld by law, judicial order or otherwise.

d.  **Expense Reimbursement.** The Company shall reimburse Associate for all reasonable business expenses incurred by Associate in the course of performing his/her duties and responsibilities hereunder, subject to the Company's normal and customary practices and policies as are in effect from



# Exhibit A

time to time with respect to travel, entertainment, and other business expenses (including the Company's reasonable requirements with respect to prior approval, reporting and documentation of such expenses).

  e.  <u>Benefits</u>. The Company will provide or offer for Associate's participation such benefits as are generally provided or offered by the Company to its other Associates, including, without limitation, health and dental insurance, eligibility for participation in the Company's 401(k) plan, discounted health club membership, and other fringe benefits (collectively, "Benefits"), if and to the extent that Associate is eligible to participate in accordance with the terms of the applicable Benefit plan or program generally. The Company reserves the right to change the terms and conditions of such Benefits at any time. Associate shall be entitled to two (2) weeks of paid vacation per [full year of service/calendar year], together with paid holidays, all in accordance with the Company's normal and customary practices and policies as are in effect from time to time.